CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
6/25/2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA

---

**SERIOUS BUSINESS PR, LLC.,**

        Plaintiff,

-against-

**ANCIENT DRINKS, LLC.,**

        Defendant.

**COMPLAINT**

Civil Action No. 3:24cv00048

---

Plaintiff, **SERIOUS BUSINESS, PR LLC.**, (hereinafter "Plaintiff"), by their attorneys, ALTER AND BARBARO, ESQS., as and for their Complaint, respectfully allege as to the following:

## PARTIES

1. Plaintiff, **SERIOUS BUSINESS, PR, LLC.**, is a domestic limited liability company, formed in the State of Delaware and authorized to do business under the laws of the State of New York with offices in the city of Brooklyn, State of New York, borough of Kings, DOS ID #3925928, and the Commonwealth of Virginia as a Limited Liability Company, Entity ID: 11710694. (hereinafter referred to as "Plaintiff").

2. At all times hereinafter mentioned, Plaintiff, held and continues to hold its primary office at 61 9th Street, #B4, Brooklyn, NY 11215.

3

3. Zoe Turnbull and Krista Freibaum are natural persons, who are the founders and owners of the Plaintiff Company.

4. Defendant, **ANCIENT DRINKS, LLC** (hereinafter "Defendant"), is a limited liability company, duly organized and to do business under the laws of of the State of Virginia with offices in the city of Charlottesville, State of Virginia, county of Charlottesville, Entity ID# 11343796.

5. At all times hereinafter mentioned, Defendant held and continues to hold its primary place of business at 134 10th Street, NW #3, Charlottesville, VA 22903. (hereinafter "Defendant").

6. Josh Rogers is a natural person who is the founder and Chief Executive Officer of the Defendant Company.

## JURISDICTION

7. The matter in controversy exceeds, exclusive of interests and costs, the sum specified within 28 U.S.C. § 1332 (a).

8. This court has jurisdiction over these proceedings as this is an action for $75,000, or more, and within the jurisdictional limits of this court.

9. This court has jurisdiction over this matter as there is complete diversity between parties and the amount in controversy is above the minimum jurisdictional limits.

10. This court has personal jurisdiction over the Defendant named herein because the Defendant is a corporation organized under the laws of the State of New York with its principal place of business in New York (but still validly registered and authorized to transact business in the Commonwealth of Virginia).

4

## VENUE

11. Venue is proper in the Charlottesville Division of the United States District Court for the Western District of Virginia pursuant to 28 U.S.C. § 1391 (c) (2) and pursuant to Article 12, Paragraph "(i)" of the "Services Agreement" (hereinafter "the Agreement") agreed to by both Plaintiff and Defendant on November 1, 2023 (See **Exhibit A, p, 6, Section 12 (i)**).

12. Under 28 U.S.C. §1391 (d), "in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State."

13. Additionally, as per the Western District of Virginia local Rule 2 (b), venue is proper in the Charlottesville Division of the United States District Court for the Western District of Virginia pursuant to the Rules of this court because a substantial part of the events or omissions giving rise to the claim occurred in the City and County of Charlottesville, Virginia and the Defendant's primary place of business is located within Charlottesville County which is within the Charlottesville Division of the United States District Court for the Western District of Virginia.

## BACKGROUND

14. On November 1, 2023, Plaintiff and Defendant signed the Agreement outlining both Plaintiff and Defendants obligations to one another. (See **Exhibit A**).

15. Within the Agreement, Defendant agreed to pay Plaintiff a monthly retainer fee of $7,000.00 per month, subject to a 1.5% late fee for any invoices that remain unpaid for more than thirty (30) days. (See **Exhibit A, p. 2, Section 3(a)**).

5

16. In addition to the monthly retainer fee, a predetermined number of "Incentive Units" would also vest monthly to Plaintiff over the course of the relationship (hereinafter referred to as "IU's"), as determined by the Agreement. (See **Exhibit A, p. 2, Section 3(b)**).

17. Based on the Defendant Company being valued at $6.5 million, a total of $81,000.00 worth of IU's (or 31,953 IU's) were to vest to Plaintiff upon the expiration of the one (1) year term of the contract.

18. Based on the foregoing, each IU was determined to be worth $ 2.53 at the time the Agreement was executed.

19. Plaintiff informed Defendant and Defendant-Owner that Plaintiff's standard monthly retainer fee was $12,000.00-$15,000.00. (See **Exhibit B**).

20. Prior to contracting this relationship with Plaintiff, Defendant compensated Plaintiff $12,000.00 for one (1) month of Plaintiff work. (See **Exhibit C**).

21. Defendant was aware that Plaintiff's standard monthly retainer fee was $12,000.00-$15,000.00.

22. However, in lieu of the $5,000.00 - $8,000.00 *not* provided by Defendant, as part of Plaintiff's monthly retainer fee, both Plaintiff and Defendant consented to Defendant providing Plaintiff IU's in the Defendant Company.

23. Plaintiff agreed to accept a reduced monthly retainer fee of $7,000.00, in addition to the IU's, in lieu of Plaintiff's typical $12,000.00 monthly retainer. ( (See **Exhibit A, p. 2, Section 3(a) and 3(b)**).

24. Per Article 4, Paragraph "(b)" of the Agreement, if Defendant, or Defendant-Owner wished to terminate the service relationship, *at least* sixty (60)

6

days advance written notice would need to be provided. (See **Exhibit A, p. 3, Section 4(b)**).

25. However, if Defendant terminated the Agreement "without cause" within seven (7) months of November 1, 2023, Defendant was liable to pay Plaintiff an "Early Termination Fee." (hereinafter referred to as "ETF").

26. The Agreement defined the EFT as the retainer fee, multiplied by the number of whole months remaining between the date that Defendant gave notice of termination and seven (7) months following November 1, 2023. (See **Exhibit A, p. 3, Section 4(c)**).

27. However, "cause" is *not* defined within the "Services Agreement."

28. "Cause," is also *not* defined within Defendant's 36-page "Non-Voting Profits Interest Grant Agreement" that the parties executed. (See **Exhibit D**).

29. Since signing the Agreement on November 1, 2023, Plaintiff had generated hundreds of thousands of dollars in profit and promotion for Defendant.

30. From November 1, 2023 through April 23, 2024 (the date of termination) Plaintiff spent over 600 hours on Defendant's work, which is almost double what was scoped (the Scope of Work provided for 320 hours over the course of 6 months), including bringing on additional members of Plaintiff's team for over three (3) months to handle the demanding work load Defendant presented to Plaintiff.

31. Plaintiff generated the equivalent of almost $400,000.00 in both VIP social media and press coverage during the contract period of November 1, 2023 and April 23, 2024, including, collaborative posts from Plaintiff's talent pool which

7

"boosted" the online and social media presence of the Defendant's company, as as well as traffic to their Amazon store - posts which Defendant did not pay for.

32. Plaintiff embarked on consumer and trade press outreach for Defendant in which Plaintiff created various press placements for Defendant, with a paid equivalency value of over $20,000.00, in addition to Plaintiff generating over twelve (12) consumer press leads, with a potential advertising equivalency value for Defendant of over $100,000.00, before being terminated.

33. Plaintiff's work continued to provide value and generate press leads and social media coverage for Defendant following Plaintiff's termination.

34. Plaintiff provided work for Defendant in March and April 2024, but was *not* compensated for work performed and provided during these months.

35. Plaintiff created an event and trade showcase opportunity for the equivalent of $50,000.00 (fifty thousand dollars) with the *Wall Street Journal* which Defendant-Owner, JOSH ROGERS, embarked on even *after* Defendant terminated the Agreement with Plaintiff.

36. Defendant-Owner, JOSH ROGERS, on a repeated basis, forced delays with Plaintiff's work product by refusing to make requested changes and requests by Plaintiff as well as forcing Plaintiff to re-organize their strategies and plans and slowing down the work Plaintiff was able to deliver to Defendant.

## AS FOR THE FIRST CAUSE OF ACTION AGAINST DEFENDANT ANCIENT DRINKS, LLC FOR BREACH OF CONTRACT

37. Plaintiff re-alleges every allegation contained in Paragraph 1 through 36 above as if set forth fully and at length herein.

8

38. On or about April 23, 2024, Defendant-Owner, JOSH ROGERS, terminated Plaintiff's services. (See **Exhibit E** ).

39. Defendant terminated the Agreement within six (6) months of signing the agreement.

40. Defendant-Owner, JOSH ROGERS, *did not* provide Plaintiff with *at least* sixty (60) days advance written notice as per Article 4, Paragraph "(b)" of the Agreement.

41. Because of Defendant's failure to provide Plaintiff *at least* sixty (60) days advance written notice as per Article 4, Paragraph "(b)" of the Agreement, Plaintiff suffered monetary losses.

42. Plaintiff has not been reimbursed for shipping costs, product storage, and other expenses incurred by Plaintiff because of Defendant's failure to give Plaintiff *at least* sixty (60) days advance written notice as per Article 4, Paragraph "(b)" of the Agreement.

43. Because Defendant terminated the agreement "without cause" within seven (7) months of November 1, 2023, Plaintiff is owed the ETF, defined in the Agreement as the retainer fee, multiplied by the number of whole months remaining between the date that Defendant gave notice of Early Termination and seven (7) months following November 1, 2023. (See **Exhibit A p. 3, Section 4(c)**).

44. The ETF described *supra*, which Defendant owes Plaintiff, is for a sum of $12,000.00.

45. Additionally, Defendant continues to unreasonably withhold payment of fees owed for work performed and completed by Plaintiff prior to Defendant's "early termination" of the Agreement.

46. Despite Plaintiff's counsel sending a demand letter requesting payment, Defendant and Defendant owner *blatantly* ignored this request.

47. To date, Defendant has accrued arrears, in the amount of $7,885.45 (subject to the applicable 1.5% interest, applied every 10 days) for failure to pay their March 2024 invoice, in the amount of $7,540.88 (subject to the applicable 1.5% interest) for failure to pay their April 2024 invoice, in addition to out of pocket expenses Plaintiff incurred during those same months, in the amount of $2,409.08 (not subject to interest) for a total outstanding balance due to Plaintiff of $17,835.41; an amount which Defendant continues to unreasonably withhold from Plaintiff[1].

48. As of April 2024, when Defendant terminated the Agreement, 17,748 IUs had vested.

49. In accordance with the valuation of IUs at the commencement of the Agreement, and noted in Paragraphs 16 through 18, the 17,748 IUs that vested have an estimated value of $44,902.00.

50. Per the Agreement, given Defendant's manner of termination (without cause), Defendant is obligated to repurchase the IU's that vested to Plaintiff.

51. Given the ETF described *supra*, Defendant owes Plaintiff a sum of $12,000.00.

52. As a result of Defendant's breach of their contractual duties, Plaintiff has been damaged in the amount of seventy four thousand and five hundred and nine dollars ($74,737.41), in addition to any increase in the value of the vested IU's,

---

[1] Per the invoices from Serious Business every ten (10) days interest continues to accrue on the outstanding amount. As of July 1, 2024, the amounts outlined *supra* will increase in accordance with the applicable interest.

or an amount to be determined at trial, plus punitive damages, and attorneys' fees and costs.

## AS FOR THE SECOND CAUSE OF ACTION AGAINST DEFENDANT ANCIENT DRINKS, LLC FOR QUANTUM MERUIT

53. Plaintiff re-alleges every allegation contained in Paragraph 1 through 52 above as if set forth fully and at length herein.

54. On November 1, 2023, Plaintiff and Defendant signed the Agreement outlining both Plaintiff and Defendants obligations to one another.

55. As per the Agreement, Defendant, or Defendant-Owner, must provide Plaintiff with *at least* sixty (60) days advance written notice as per Article 4, Paragraph "(b)." (See **Exhibit A p. 3, Section 4(b)**).

56. Defendant, through Defendant-Owner, terminated the Agreement between Plaintiff and Defendant on April 23, 2024, effective immediately.

57. Because of Defendant's failure to give Plaintiff *at least* sixty (60) days advance written notice as per Article 4, Paragraph "(b)" of the Agreement, Plaintiff suffered monetary losses.

58. Because of Defendant's failure to give Plaintiff *at least* sixty (60) days advance written notice as per Article 4, Paragraph "(b)" of the Agreement, the Defendant company and Defendant-Owner continue to benefit, solely at the expense of Plaintiff's company.

59. Prior to Plaintiff's abrupt termination, Plaintiff, and Plaintiff's employees, were actively working on projects for Defendant and Defendant-Owner.

60. Plaintiff, and Plaintiff's employees, were working under a good faith expectation of payment, from Defendant, for services Plaintiff rendered on behalf of Defendant company.

61. Due to the lack of *at least* sixty (60) day written notice provided to Plaintiff, Plaintiff, and Plaintiff's employees, had *no* time to "wrap-up" any active projects being worked on behalf of Defendant.

62. Throughout the relationship between Plaintiff and Defendant-Owner, Defendant-Owner continuously criticized Plaintiff and demanded unrealistic timeline expectations for work product and strategies already outlined by Plaintiff and dictated by outside variables over which Plaintiff had no control (ie: retail timings that were controlled by third parties).

63. Defendant-Owner's expectations were that of unrealistic results, necessitating the numerous hours of additional time spent working on Defendant's project, which were not contracted for, and for which Plaintiff was not compensated.

64. Due to the lack of time to "wrap-up" active projects, Plaintiff and Plaintiff employees were forced to continue working on projects for the Defendant *after* Plaintiff had already been terminated, which was not contracted or, and for which Plaintiff was not compensated.

65. Defendant, via Defendant-Owner, terminated the Agreement improperly and prematurely *without* providing compensation for services rendered by Plaintiff and Plaintiff's employees.

66. Defendant, *nor* Defendant-Owner, provided *any* compensation for work performed and delivered to Defendant following Plaintiff's improper termination.

67. Defendant, *nor* Defendant-Owner, paid the ETF as per the Agreement which resulted in the instant lawsuit.

68. As a result of Defendant's breach of their contractual duties, Plaintiff deserves reasonable compensation for the additional work that was required of them, amounting to $100,000.00 (one hundred thousand dollars), or an amount to be determined at trial, plus punitive damages, and attorneys' fees and costs.

## AS FOR THE THIRD CAUSE OF ACTION AGAINST DEFENDANT ANCIENT DRINKS, LLC FOR UNJUST ENRICHMENT

69. Plaintiff re-alleges every allegation contained in Paragraph 1 through 68 above as if set forth fully and at length herein.

70. Plaintiff performed services and spent time, above and beyond what was called for in the "Scope of Work" Plaintiff presented to Defendant.

71. Plaintiff spent almost double the estimated time on Defendant's work in an attempt to satisfy Defendant's unrealistic expectations.

72. The time spent does not include the exorbitant amount of time Plaintiff spent attempting to wrap up Defendant's work after Defendant's improper termination of Plaintiff.

73. As referenced, *supra*, Plaintiff was improperly terminated, without the requisite notice protocol as outlined in the Agreement.

74. The contract *officially* began on November 1, 2023 and Plaintiff was terminated on April 23, 2024, six (6) months and three (3) weeks after the commencement of the contract.

75. During March 2024 Plaintiff actively worked for, and provided work product to, Defendant and Defendant-Owner (see para. 30 through 35 above) for which Plaintiff has not been compensated by Defendant.

76. During April 2024 Plaintiff actively worked for, and provided work product to, Defendant and Defendant-Owner (see para. 30 through 35 above) for which Plaintiff has not been compensated by Defendant.

77. Plaintiff has also *not* been compensated for the out of pocket expenses incurred during the months of March 2024 and April 2024.

78. Throughout the relationship between Plaintiff and Defendant-Owner, Defendant-Owner pedantically criticized and demanded unrealistic timeline expectations for work product provided by Plaintiff, causing Plaintiff's employees to spend *double* the time Plaintiff anticipated spending on Defendant's work.

79. Defendant benefitted from Plaintiff's work (namely the VIP social media, press outreach and Wall Street Journal event) solely at the expense of Plaintiff.

80. Plaintiff was not compensated for work performed following Defendant's improper termination of Plaintiff.

81. As a result of Defendant's breach of their contractual duties, Defendant benefited from Plaintiff's services, at the expense of Plaintiff's time and work but Plaintiff was not compensated accordingly, suffering damages in the amount of $100,000.00 (one hundred thousand dollars), or an amount to be determined at trial, plus punitive damages, and attorneys' fees and costs.

**WHEREFORE**, Plaintiffs demands judgment:

1. On the First Cause of Action for an Order in favor of Plaintiff to be issued directing Defendant, ANCIENT DRINKS, to pay all sums due and owing in the amount of ($74,737.41) *immediately*, in addition to any increase in the value of the vested IU's, or an amount to be determined at trial, plus punitive damages, and attorneys' fees and costs.

2. On the Second Cause of Action for a judgment in favor of Plaintiff, SERIOUS BUSINESS, against Defendant, ANCIENT DRINKS, in the amount of $100,000.00 or an amount to be determined at trial, plus punitive damages, and attorneys' fees and costs

3. On the Third Cause of Action for a judgment in favor of Plaintiff, SERIOUS BUSINESS, against Defendant, ANCIENT DRINKS, in the amount of $100,000.00 or an amount to be determined at trial, plus punitive damages, and attorneys' fees and costs and such other and further relief which this Court may deem just and proper under the circumstances.

Dated: Brooklyn, New York
June 25, 2024

**ALTER& BARBARO, ESQS.**
*Attorneys for Plaintiff*
26 Court Street, Room 1812
Brooklyn, New York 11242
Ph: (718)237-0880

By: _____
**BERNARD MITCHELL ALTER, ESQ.**

15